**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gila River Indian Community, | No. CV-19-00407-TUC-SHR |
| Plaintiff, | **Order Re: Motions for Summary Judgment, Motion to Dismiss Complaint-in-Intervention, and Motion to Strike/Motion for Sanctions** |
| and | |
| San Carlos Apache Tribe, | |
| Plaintiff-Intervenor, | |
| v. | |
| David Schoebroek, et al., | |
| Defendants. | |

Pending before the Court are:

- Plaintiff Gila River Indian Community's Motion for Summary Judgment (Doc. 78), which Plaintiff-Intervenor San Carlos Apache Tribe joins (Doc. 112) (collectively, "Plaintiffs");

- The "Motion for Summary Judgment on Claim Preclusion Grounds" filed by Defendants David Schoebroek, Eva Schoebroek, Donna Sexton, Marvin Sexton, and Patrick Sexton (collectively, "Defendants") (Doc. 87);

- Defendants' "Motion for Summary Judgment on the Application of the Prior Exclusive Jurisdiction Doctrine and the Validity and Enforceability of Forum Selection Clause" (Doc. 89);

- Defendants' "Rule 12(b)(1) Motion to Dismiss the San Carlos Apache

Tribe's Complaint in Intervention Based on the Prior Exclusive Jurisdiction Doctrine" (Doc. 111); and

- Plaintiffs' "Joint Motion to Strike Defendants' Motion to Dismiss the San Carlos Apache Tribe's Complaint-in-Intervention and Motion for Sanctions" (Doc. 116).

## I.   BACKGROUND[1]

This case arises from a dispute brought by the Gila River Indian Community (the "Community") over whether Defendants' four wells are pumping Gila River water in violation of the Globe Equity No. 59 Decree[2] (the "Decree").  (Docs. 1, 112.)  Plaintiffs seek:  (1) an order declaring Defendants have been and are pumping Gila River subflow[3] and irrigating their land without a Decree right; (2) an order "directing the Gila Water Commissioner to cut off and seal [Defendants'] wells diverting the waters of the Gila River without a Decree right, including the wells being used to irrigate [Defendants' lands], by removing the meters from the electrical power connection to the pumps, severing the pipe leading from the pump to the irrigation delivery system, and welding a metal cap onto the pipe where it has been severed"; and (3) an injunction requiring Defendants "to cease and prevent diversion, pumping, or delivery of [Gila River water] without Decree rights."

---

[1]In the interest of brevity, the Court will not repeat but adopts the detailed factual background in Judge Bolton's May 12, 2020 Order.  (Doc. 22 ("2020 Bolton Order") at 1–5.)

[2]The Globe Equity litigation, *United States v. Gila Valley Irrigation District, et al.*, No. CV-31-00059 ("*GE 59*"), resulted in a consent decree entered in 1935 known as the "GE 59" or "Globe Equity" Decree, which settled all parties' rights to the Gila River mainstem waters.

[3]"Subflow" is "a purely legal, not scientific, term," and "defining its boundaries is not only difficult at best but also turns ultimately on resolution of factual questions."  *In re Gen. Adjudication of All Rts. to Use Water in Gila River Sys. & Source*, 9 P.3d 1069, 1076 (Ariz. 2000) ("*Gila IV*").   The Arizona Supreme Court has defined subflow as "those waters which slowly find their way through the sand and gravel constituting the bed of the stream, or the lands under or immediately adjacent to the stream, and are themselves a part of the surface stream."  *Id.* at 1073 (quoting *Maricopa Cnty. Mun. Water Conservation Dist. No. 1 v. Sw. Cotton Co.*, 4 P.2d 369, 380 (Ariz. 1931)); *see also In re Gen. Adjudication of All Rts. to Use Water in Gila River Sys. & Source*, 857 P.2d 1236, 1244 n.9 (Ariz. 1993) ("*Gila River II*") (internal citations omitted).

1   (Doc. 1 ¶¶ 67–83.)

2        In 2019, Defendants moved to dismiss the Community's Complaint for lack of

3   subject-matter jurisdiction and argued, among other things, the Court must abstain in

4   deference to the ongoing Gila Adjudication in Maricopa County Superior Court because of

5   the prior exclusive jurisdiction doctrine.  (Doc. 14.)  Judge Bolton rejected Defendants'

6   arguments and concluded this Court has jurisdiction over the Community's claims pursuant

7   to 28 U.S.C. §§ 1331 and 1362, and found, "[n]either the prior exclusive jurisdiction

8   doctrine nor any abstention doctrine apply."  (Doc. 22 ("2020 Bolton Order").)

9        Defendants first answered the Complaint in 2020 (Docs. 26, 34) and amended their

10   Answer with the Court's leave on November 9, 2021 (Docs. 70, 71).  Defendants admit

11   they do not have Decree rights and are pumping water through their wells, but argue they

12   are pumping non-appropriable groundwater—not Gila River subflow.  (Doc. 71.)  In their

13   Amended Answer, Defendants again asserted this Court lacks subject-matter jurisdiction

14   because the Complaint arises out of Arizona state law and does not raise a federal question,

15   the claims here were brought in an action distinct from the Globe Equity litigation,

16   Defendants are not parties to the Decree, and whether the water they are pumping is

17   groundwater or Gila River water is a "legal determination that must be adjudicated in

18   the . . . general adjudication proceedings" taking place in the Gila Adjudication Court.[4]

19   (*Id.*)  Defendants also raised claim preclusion as a defense based on a 2005 settlement

20   agreement and argued the Gila Adjudication Court is the proper venue because of a Gila

21   Adjudication Court order that says Decree enforcement disputes involving nonparties to

22   the Decree are subject to its jurisdiction.  (*Id.*)

23        On May 31, 2022, this Court granted the San Carlos Apache Tribe (the "Tribe")'s

24

25        [4]The Gila Adjudication Court within Maricopa County Superior Court presides over the Gila River general stream adjudication, the purpose of which is to "determine the extent

26   and priority of water rights in the Gila River system."  *Overview of General Stream Adjudications*, Maricopa Cnty. Superior Ct., http://www.superiorcourt.maricopa.gov/

27   SuperiorCourt/GeneralStreamAdjudication/faq.asp (last visited Aug. 31, 2023); *see also* A.R.S. §§ 45-252 to 45-264; Joseph M. Feller, *The Adjudication That Ate Arizona Water*

28   *Law*, 49 Ariz. L. Rev. 405, 406–407 (2007).

1   Motion to Intervene, which the Tribe filed after Defendants added their claim-preclusion

2   defense against the Community.  (Docs. 71, 76, 110.)  The Tribe's claims in its Complaint-

3   In-Intervention are identical to the Community's Complaint, and the Tribe joined the

4   Community's pending motions and pleadings.  (Docs. 1, 112, 113.)

5        Over the course of several months, the parties filed the pending motions.  The Court

6   held oral argument on the summary-judgment motions on Wednesday, July 26, 2023.

7   (Doc. 127.)

8   **II.**    **JURISDICTION**

9        As a court of limited jurisdiction, this Court may only hear cases as permitted by

10   Congress and the Constitution.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375,

11   377 (1994).  As explained in the 2020 Bolton Order, this Court has jurisdiction under 28

12   U.S.C. § 1362 ("The district courts shall have original jurisdiction of all civil actions,

13   brought by any Indian tribe or band with a governing body duly recognized by the Secretary

14   of the Interior, wherein the matter in controversy arises under the Constitution, laws, or

15   treaties of the United States."), and, alternatively, under 28 U.S.C. § 1331 ("The district

16   courts shall have original jurisdiction of all civil actions arising under the Constitution,

17   laws, or treaties of the United States.").

18   **III.**    **SUMMARY JUDGMENT STANDARD**

19        Under Federal Rule of Civil Procedure 56(a), upon a party's motion, a court "shall

20   grant summary judgment if the movant shows that there is no genuine dispute as to any

21   material fact and the movant is entitled to judgment as a matter of law."  A genuine dispute

22   exists if "the evidence is such that a reasonable jury could return a verdict for the

23   nonmoving party," and material facts are those "that might affect the outcome of the suit

24   under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

25   Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's

26   position is insufficient to defeat summary judgment.  *Id.* at 252; *see also Matsushita Elec.*

27   *Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken

28   as a whole could not lead a rational trier of fact to find for the non-moving party, there is

no genuine issue for trial" (internal quotation marks and citation omitted)).  In evaluating a motion for summary judgment, the evidence of the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.  "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

## IV.  MOTIONS FOR SUMMARY JUDGMENT

Defendants argue this Court must abstain from this case because of:  (1) the prior exclusive jurisdiction doctrine; (2) a forum-selection clause; and (3) estoppel.  They also argue claim preclusion bars Plaintiffs' claims.  Plaintiffs argue the undisputed facts show they are entitled to judgment on the merits.  For the reasons that follow, the Court denies Defendants' motions for summary judgment[5] and grants in part Plaintiffs' motion for summary judgment.

### A. **Defendants' Motion Re: Prior Exclusive Jurisdiction, Forum Selection, and Estoppel**

#### 1.  Prior Exclusive Jurisdiction Doctrine

"Under the Supreme Court's long-standing prior exclusive jurisdiction doctrine, if a state or federal court 'has taken possession of property, or by its procedure has obtained jurisdiction over the same,' then the property under that court's jurisdiction 'is withdrawn from the jurisdiction of the courts of the other authority as effectually as if the property had been entirely removed to the territory of another sovereign.'"  *Sexton v. NDEX W., LLC*, 713 F.3d 533, 536 (9th Cir. 2013) (quoting *State Engineer v. S. Fork Band of Te–Moak Tribe of W. Shoshone Indians*, 339 F.3d 804, 809 (9th Cir. 2003)); *see also United States*

---

[5]The Court grants Defendants' "Request for Judicial Notice in Support of Defendants' February 18, 2022 Filings," (Doc. 91), which Plaintiffs did not oppose (Doc. 109).

1    *v. One 1985 Cadillac Seville*, 866 F.2d 1142, 1145 (9th Cir. 1989) ("The purpose of the

2    rule is the maintenance of comity between courts; such harmony is especially compromised

3    by state and federal judicial systems attempting to assert concurrent control over the res

4    upon which jurisdiction of each depends.").  That is, "when one court is exercising in rem

5    jurisdiction over a res, a second court will not assume in rem jurisdiction over the same

6    res." *Marshall v. Marshall*, 547 U.S. 293, 296 (2006).  "Although the doctrine is based at

7    least in part on considerations of comity and prudential policies of avoiding piecemeal

8    litigation, it is no mere discretionary abstention rule.  Rather, it is a mandatory jurisdictional

9    limitation." *Chapman v. Deutsche Bank Nat'l Tr. Co.*, 651 F.3d 1039, 1043 (9th Cir. 2011)

10   (quoting *S. Fork Band of Te–Moak Tribe*, 339 F.3d at 810).  Therefore, if a state court has

11   first exercised jurisdiction over the *rem* at issue, then the "federal court *must* yield to a prior

12   state proceeding." *1985 Cadillac Seville*, 866 F.2d at 1145.

13        Defendants argue this Court "should abstain from exercising jurisdiction under the

14   prior exclusive jurisdiction doctrine" for two main reasons.  First, the Gila Adjudication

15   Court first obtained jurisdiction over the wells in this case because Defendants'

16   predecessors-in-interest filed claims for those wells in 1985. (Doc. 89 ep[6] 14–15; DSOF[7]

17   ¶ 3; Exhs. 80, 64 (Statement of Claimant forms filed by Defendants' predecessors-in-

18   interest with the Arizona Department of Water Resources for the Gila Adjudication

19   proceedings[8]).)  Second, the Court "may revisit its prior order declining to abstain" and

20   should because when Judge Bolton denied Defendants' motion to dismiss this case, she

21

22        [6]The Court uses "ep" to refer to the electronic page number.

23        [7]Defendants' "Separate Statement of Facts In Support of Motion for Summary

24   Judgment on the Application of the Prior Exclusive Jurisdiction Doctrine and the Validity
     and Enforceability of Forum Selection Clause" ("DSOF") is docketed at item 90 in the
     electronic record.

25        [8]The Community argues Defendants are "not allowed to use" the Statement of

26   Claimant forms filed by their predecessors-in-interest because they were not disclosed
     during discovery.  (Doc. 103 ep 14.)  *See* Fed. R. Civ. P. 37(c)(1).  However, as the

27   Community notes, those documents "make no difference" because the Gila Adjudication
     Court lacks jurisdiction to determine mainstem rights (Doc. 103 ep 14), so the late

28   disclosure is harmless.  *See id.*

"did not have the benefit of" the Gila Adjudication Court's order approving the 2005 settlement agreement, and discovery has since revealed Defendants' predecessors-in-interest filed Statements of Claimant in the Gila Adjudication.   (Doc. 89 ep 15–17.) Defendants disagree with Judge Bolton's determination this Court has jurisdiction over this case because it involves mainstem waters, while the Gila Adjudication Court only has jurisdiction over tributary waters.  (*Id.* ep 16–17.)  Defendants do not dispute this Court has continuing jurisdiction to enforce the Decree; rather, they contend this Court lacks jurisdiction to enforce the Decree against *them* because they are not parties to it and the Decree's "retention of jurisdiction is not broad enough to encompass nonparties to the Decree" and the Decree is not the exclusive source of mainstem rights, as "there are state court decrees involving mainstem rights predating the [] Decree." (*Id.* ep 17.)

In Response, Plaintiffs argue this Court has jurisdiction over the claims here because they involve mainstem waters and this Court has "continuing jurisdiction over all claims to mainstem waters," while the Gila Adjudication Court has jurisdiction over tributaries. (Doc. 103 ep 10.)  As to Defendants' assertion the Gila Adjudication Court first obtained jurisdiction over the wells at issue here, Plaintiffs argue the Statements of Claimant filed by Defendants' predecessors-in-interest "make no difference because the Gila Adjudication [C]ourt lacks jurisdiction to determine mainstem rights" and "do not divest this Court of its exclusive jurisdiction over all mainstem rights." (*Id.* ep 14.)  As to state decrees that predate the Decree here, Plaintiffs assert the Decree here supersedes prior decrees as to mainstem rights and note Defendants admitted any mainstem rights in the prior decrees were incorporated into the Decree.  (*Id.* ep 15–16 (citing Doc. 16 (Defendants' Reply in Support of Rule 12(b)(1) Motion to Dismiss) ep 10–11 ("The Doan, Jenckes, Lockwood, and Ling decrees were largely folded into the Globe Equity Decree.").)

Defendants' Reply primarily asserts jurisdiction turns on whether the dispute involves nonparties to the Decree.  (Doc. 108 ep 3–7.)  In their view, because they are not parties to the Decree, this case belongs in state court.   In contrast, Plaintiffs argue

jurisdiction turns on whether the claims involve mainstem or tributary waters: if the claims involve mainstem water, then this Court should hear the case; if the claims involve tributary water, then the Gila Adjudication Court should hear it. In essence, the parties disagree about whether jurisdiction turns on the character of the parties themselves or the character of the water at issue. For the following reasons, the Court concludes jurisdiction depends on whether the water at issue is allegedly from the Gila River mainstem or its tributaries.

As explained by the Arizona Supreme Court, "the Decree was intended to resolve all claims to the Gila River mainstem," and, "as to the mainstem of the Gila River, the Decree is comprehensive." *In re Gen. Adjudication of All Rts. To Use Water In Gila River Sys. & Source*, 127 P.3d 882, 902 (Ariz. 2006) ("*Gila VI*"). The Arizona Supreme Court further noted the Decree precludes parties to it from asserting additional claims to the Gila River mainstem. *Id.* at 903. In that case, the litigants disagreed as to the scope of the Decree and its preclusive effects, including whether non-parties could assert the Decree's preclusive effects against parties to the Decree. *Id.* at 888–902. The Arizona Supreme Court explained the Decree's scope is "comprehensive" as to the Gila River mainstem and concluded "those who were not party to the Decree are entitled to assert its preclusive effects against parties to the Decree and their successors" with respect to the Gila mainstem. *Id.* (citing *Nevada v. United States*, 463 U.S. 110, 143–44 (1983) (applying exception to mutuality requirement for claim preclusion and allowing non-party to a decree to enforce decree against a party to the decree)).

While non-parties to the Decree can assert the Decree's preclusive effects against Decree parties, the parties have not identified, and the Court is unaware of, any authority establishing whether Decree parties, like Plaintiffs, can assert the Decree's preclusive effects against non-parties to the Decree. Indeed, much of Defendants' motion hinges on their argument the Decree can only bind the parties to it.

Before this Court can abstain or apply the prior exclusive jurisdiction, Defendants must first establish the Gila Adjudication Court has jurisdiction over their wells. Defendants have failed to do so. As explained by the Arizona Supreme Court and Judge

Bolton, the *GE 59* litigation was comprehensive as to all mainstem rights and, therefore, the Decree is the exclusive source of all rights to the Gila mainstem, while the Gila Adjudication Court has jurisdiction over rights to the Gila tributaries.  *See Gila VI*, 127 P.3d at 898–94 ("The rights of those with claims to the Gila River *tributaries* will be determined in this Gila River general stream adjudication.  To the extent that those [tributary] rights conflict with rights vested under the Decree, that issue can be addressed by the superior court in future proceedings." (emphasis added)).  Defendants' argument the Gila Adjudication Court first obtained jurisdiction over their wells is essentially an *in-rem* argument in which they assert the Gila Adjudication Court first obtained jurisdiction over the res (the wells) here when Defendants' predecessors-in-interest filed claims for those wells in the Gila Adjudication decades ago.  Although such claims were filed in the Gila Adjudication decades before this case began, Defendants point to no authority establishing the Gila Adjudication Court has jurisdiction over mainstem waters or that the mere filing of mainstem claims in the Gila Adjudication somehow divests this Court of its exclusive jurisdiction over the mainstem.  For the following reasons, the Court concludes the Decree is not only comprehensive of all mainstem rights, but is the exclusive source of mainstem rights and, therefore, precludes all additional mainstem claims, whether asserted by Decree parties or non-parties.

First, as the Arizona Supreme Court and Judge Bolton have previously explained, the *GE 59* litigation and resulting Decree were comprehensive of and intended to resolve all rights to the Gila River mainstem.  *See Gila VI*, 127 P.3d at 902; *Gila River Indian Cmty. v. Cranford*, 459 F. Supp. 3d 1246, 1256 (D. Ariz. 2020).  This is, in part, because the United States "included as defendants in the Globe Equity litigation all those with claims to the mainstem of the Gila River, and the Decree includes all water rights theories that the parties could have asserted." *Gila VI*, 127 P.3d at 902.  "In 1935, the United States entered into stipulations dismissing without prejudice all defendants who maintained claims only to waters of the Gila River tributaries.  The remaining parties stipulated to the entry of the [Decree]." *Id.* at 885.  Therefore, the Decree "explicitly states that certain

defendants, all of whom maintained claims to the tributaries, were dismissed because their claims and rights, if any, were and are outside the scope of said suit as same was and is outlined and defined in the amended complaint herein." *Id.* at 892 (internal quotations marks omitted). The Decree's express exclusion of parties with tributary claims indicates the Decree was intended to be comprehensive of mainstem rights. Further, common sense compels this Court to conclude the Decree included all possible mainstem rights that can exist because if the Decree did not include all possible mainstem rights and did not preclude non-parties to the Decree from asserting mainstem claims, then anyone not named as a party to the Decree could assert a new mainstem claim at any time. That runs contrary to the purpose of the Globe Equity litigation: to settle all possible claims and rights to the Gila River mainstem.

Second, that the Decree expressly precludes Decree parties from asserting additional mainstem claims in the future indicates the Decree was a final, comprehensive adjudication of the entire mainstem. This makes sense because the Gila River mainstem, like the Colorado River, has been over-allocated from the start, as there simply is not enough water in the river system to satisfy the allocations of all parties with water rights to the river. *See United States v. Gila Valley Irrigation Dist.*, 920 F. Supp. 1444, 1448 (D. Ariz. 1996) (*"*The river is now overdeveloped and overallocated.") In other words, because there is not enough water for everyone who has a right to the mainstem, as a practical matter, the Decree must be treated as final and comprehensive because allowing non-parties to the Decree to establish new mainstem claims would increase the amount of water being diverted from an already over-allocated river.

Third, given the scarcity of such a precious resource, certainty is a paramount concern of water users in Arizona, and this is especially true of water users with rights to the Gila River. "In Arizona, surface water[9] is subject to the doctrine of prior appropriation," which adheres to a hierarchal schedule of rights, which becomes

---

[9]This includes subflow. *See Gila IV* at 1073 (subflow includes underground waters that "are themselves a part of the surface stream").

1    particularly "important in times of shortage because preference is given according to the

2    appropriation date, allowing senior holders to take their entire allotments of water before

3    junior appropriators receive any at all." *In re Gen. Adjudication of All Rts. to Use Water*

4    *in Gila River Sys. & Source*, 35 P.3d 68, 71 (Ariz. 2001) ("*Gila V*").  Water users rely on

5    knowing where their rights fall in the hierarchy so they can plan their water use.  To allow

6    non-parties to the Decree to assert new mainstem claims would threaten the certainty on

7    which thousands of Gila River water users have relied for nearly 90 years.  This the Court

8    will not do.

9            Lastly, as to Defendants' assertion this Court should abstain because their claims

10   are before the Gila Adjudication Court, this Court notes there has been no resolution of

11   those claims and, as legal scholars have noted, there is no resolution in sight.  Rhett Larson

12   & Kelly Kennedy, *Bankrupt Rivers*, 49 U.C. Davis L. Rev. 1335, 1348  (2016); Joseph M.

13   Feller, *The Adjudication That Ate Arizona Water Law*, 49 Ariz. L. Rev. 405, 406–07

14   (2007).  While water is treated as property in Arizona, water remains a uniquely finite,

15   increasingly scarce resource.  And, the Gila Adjudication is a uniquely complex, lengthy

16   legal quagmire that spans decades and, as of 2016, involves more than 82,000 claims and

17   more than 38,000 parties.  Larson & Kennedy, *Bankrupt Rivers*, 49 U.C. Davis L. Rev. at

18   1348.  Thus, even if the Gila Adjudication Court had jurisdiction over Defendants' claims,

19   it could be years or decades longer before Defendants' claims are resolved, which means

20   years or decades more of Defendants pumping water that they might not have a right to

21   pump, which, in turn, depletes the amount of water in the Gila River system available to

22   water users who have the right to use it.  Further, although Defendants' predecessors-in-

23   interest filed Statements of Claimant for the wells at issue, those documents were filed with

24   the Arizona Department of Water Resources ("ADWR"), the claimed priority dates all

25   post-date the Decree,[10] and Defendants provide no evidence the Gila Adjudication Court

26   has exercised jurisdiction over those wells.  Simply filing a claim in a court or with a

27

28          [10]The priority dates claimed are 1950 for the Schoebroek Well, and 1940, 1947, and
     1978 for the Sexton Wells.  (Def. Exh. 64.)

- 11 -

department does not automatically bestow a court with jurisdiction over the claim.

In sum, consistent with Judge Bolton's previous order and the Arizona Supreme Court, and based on the history and content of the Decree, the unique nature of Arizona water law, and the doctrine of prior appropriation, this Court concludes the Decree is comprehensive in settling all claims to the Gila River mainstem, and is the exclusive source of rights to the Gila River mainstem.  In other words, if the Decree does not contain a right to the Gila River mainstem, then that right does not exist and may not be asserted.  Because the Decree is the exclusive source of mainstem rights, this Court has exclusive jurisdiction of claims involving mainstem rights.  Moreover, because the harm alleged in this case involves Plaintiffs' Decree rights, this Court has jurisdiction.  *See Kelly v. Wengler*, 822 F.3d 1085, 1094 (9th Cir. 2016) ("A federal court has jurisdiction to manage its proceedings, vindicate its authority, and effectuate its decrees." (internal quotations and citation omitted)).  Accordingly, the prior exclusive jurisdiction doctrine does not apply, and this Court will not abstain from exercising jurisdiction over this case.

### 2.  Forum-Selection

Defendants argue Plaintiffs stipulated to a forum-selection clause selecting the Gila Adjudication Court for claims like these because of Paragraph 14 in the Gila Adjudication Court's order approving a settlement agreement entered by the Community.  (Doc. 89 ep 19.)  As a threshold matter, this argument fails because the Gila Adjudication Court lacks jurisdiction over mainstem claims.  (2020 Bolton Order ep 14 ("The Gila Adjudication court lacks jurisdiction to determine mainstem rights.  Since this case involves Defendants' alleged use of mainstem water, this Court has exclusive jurisdiction.").)  But, even if the Gila Adjudication Court could have jurisdiction, Defendants' argument fails for multiple reasons.

When parties have agreed to a valid forum-selection clause, "a district court should ordinarily transfer the case to the forum specified in that clause." *Atl. Marine Const. Co., Inc. v. U.S. Dist. Ct. for W. Dist. Of Tex.*, 571 U.S. 49, 62 (2013).  A forum-selection clause should be enforced "unless the party challenging the clause can show 'that

1  enforcement would be unreasonable and unjust, or that the clause was invalid for such

2  reasons as fraud or overreaching,'" or "if enforcement would contravene a strong public

3  policy of the forum in which suit is brought, whether declared by statute or by judicial

4  decision." *Gemini Techs., Inc. v. Smith & Wesson Corp.*, 931 F.3d 911, 914 (9th Cir. 2019)

5  (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).

6        According to Defendants, Paragraph 14 of the Gila Adjudication Court's

7  Judgment and Decree approving the 2005 Amended and Restated Gila River Indian

8  Community Water Rights Settlement Agreement ("2005 Agreement")[11] constitutes a valid

9  and enforceable forum-selection clause.  (Doc. 89 ep 19–20.)  Paragraph 14 states:

> The Globe Equity Decree court shall continue to have
> jurisdiction over disputes among parties to the Globe Equity
> Decree regarding its enforcement.    Disputes involving
> nonparties to the Globe Equity Decree regarding its
> enforcement shall be subject to the jurisdiction of the Gila
> River Adjudication Court.

14  (Defendants' Exhibit ("Def. Exh.") 62 ¶ 14.); 2005 Agreement, Exh. 25.18.A.2 ¶ 13.)

15  Defendants argue there is no indication of fraud or overreaching in Paragraph 14, and

16  enforcement of that term "would further federal policy of avoiding piecemeal adjudication

17  of water rights by deferring to comprehensive state water right adjudications to resolve

18  water right disputes," so the clause is valid and enforceable.   (Doc. 89 ep 20–21.)

---

[11]The Community entered a settlement agreement with a variety of water users in 2005 to resolve a 2001 complaint ("2001 Complaint") in this Court which alleged certain wells were pumping percolating groundwater or subflow of the Gila River.  (*GE 59*, Doc. 6595.)  Rather than continuing to litigate that case, the parties negotiated a comprehensive settlement agreement that resulted in the dismissal of the 2001 Complaint.  (*Id.*)  *See* 2005 Amended and Restated Gila River Indian Cmty. Water Rts. Settlement Agreement ("2005 Agreement"), (Dec. 21, 2005, amended Aug. 24, 2007).  The settlement was approved by Congress in 2004, and the approving legislation conditioned enforcement, in part, on both the approval of this Court and the Gila Adjudication Court.  *See* Ariz. Water Settlements Act, Pub. L. No. 108-451 § 207(c)(1)(G), 118 Stat 3478 (December 10, 2004).  Both courts approved the settlement after hearing objections.  (*GE 59*, Doc. 6595; *In Re the Gen. Adjudication of All Rts. to Use Water in the Gila River Sys. and Source*, Contested Case No. W1-207, Judgment and Decree (Maricopa Cnty. Sup. Ct. Sept. 13, 2007) (Def. Exh. 62).)

Defendants assert Paragraph 14 is a mandatory forum-selection clause because it "delineates which types of disputes are subject to the jurisdiction" of each court—this Court hears disputes among Decree parties, and the Gila Adjudication court hears disputes involving non-parties to the Decree—and to construe Paragraph 14 as being permissive would suggest both courts have concurrent jurisdiction over both types of disputes, which "would be contrary to the plain division of jurisdiction set forth in Paragraph 14." (*Id.* ep 21–22.) Lastly, Defendants contend they can enforce Paragraph 14 against the Community because although they are not parties to the 2005 Agreement, they are parties to the Gila Adjudication, in which the Judgement and Decree approving the 2005 Agreement were entered. (*Id.* ep 23.)

The Community first notes that in approving the 2005 Agreement, Judge Bolton refused to adopt the parties' proposed form of order because it included generalized language about this Court's jurisdiction and, in so doing, Judge Bolton specifically held this Court has jurisdiction over pumping on the mainstem by non-parties to the Decree. (Doc. 103 ep 18.)   The parties' stipulation of judgment and proposed order seeking approval of the 2005 Agreement asked Judge Bolton to approve the entire Agreement "to the extent of this court's jurisdiction in this cause of action," which Judge Bolton declined to do because she found the Court had no jurisdiction over the matters addressed in the Agreement, except for the Upper Valley Forbearance Agreement ("UVFA"), which was an exhibit to the 2005 Agreement.[12]  (*GE 59*, Doc. 6595 at 4.)  After the parties submitted a revised proposed form of order that involved only the UVFA, Judge Bolton approved the 2005 Agreement. (*GE 59*, Docs. 6592, 6596.)  Paragraph 8 of that Order, dated August 24, 2007, provides:

> Notwithstanding any other provision of this Order, the Plaintiff Stipulators may take any enforcement action available to them against any owner of Hot Lands with respect to such Hot Lands

---

[12]The Upper Valley Forbearance Agreement ("UVFA") is one of multiple sub-agreements contained in the 2005 Agreement. *See* 2005 Agreement, Exh. 26.2. The UVFA was entered between the Community and many other water users located in the upper valley of the Gila River. (*GE 59*, Doc. 6482 ¶ 1.2.)

> that has not executed the [UVFA] by six (6) months . . . with
> respect to the Hot Lands regarding which such owner has not
> signed the [UVFA].

(Doc. 6596 ("2007 Dismissal Order").)  As Judge Bolton explained, the UVFA attempted to resolve concerns about wells being pumped by landowners without Decree rights, whose wells were likely pumping Gila River subflow; these lands were referred to as "Hot Lands." (*GE 59*, Doc. 6595 at 5.)  The parties to the UVFA agreed to try to persuade the Hot Lands owners to attempt to obtain Decree rights via the sever-and-transfer process.  (*Id.*)  To the extent those landowners were successful and obtained Decree rights, the problem of unauthorized use of subflow would be resolved and their lands would no longer be Hot Lands.  (*Id.*)  To the extent Hot Lands owners tried but were unsuccessful in obtaining Decree rights, these landowners would agree their wells would never pump more than four acre-feet per year, and the parties to the UVFA would agree not to sue to stop that pumping; these lands would then be deemed "Special Hot Lands."  (*Id.*; *GE 59*, Doc. 6482 at 15, ¶ 2.32.)  The UVFA contained no such promises for owners of Hot Lands who continued to pump Gila River subflow and did not attempt to obtain Decree rights through the sever-and-transfer process.  (*GE 59*, Doc. 6595 at 5.)  In other words, the Community agreed it would not sue to stop pumping when landowners at least tried to obtain Decree rights, and thus acquired Special Hot Lands status, but it made no such promise with respect to Hot Lands owners who did not at least try to obtain Decree rights.

The Community asserts Paragraph 8 above demonstrates that those Hot Lands owners who did not sign the UVFA and did not attempt to obtain Decree rights (and thus did not acquire Special Hot Lands status) "would still be subject to Decree enforcement in this Court."  (Doc. 103 ep 14.)  The Court agrees.

First, the Gila Adjudication Court's order adopting the 2005 Agreement is not binding on this Court and Defendants point to no authority showing otherwise.

Second, Paragraph 14 of the Gila Adjudication Court order was not adopted by this Court when Judge Bolton approved the 2005 Agreement.  Notably, when Judge Bolton expressly rejected the parties' original form of order as overbroad, she explained that under

the UVFA, the Community made no promises about suing Hot Lands owners in the future, and expressly stated this Court has jurisdiction to interpret, administer, and enforce the Decree "in order to protect the rights of the parties under the Decree." (*GE 59*, Doc. 6595 at 4.) Paragraph 8 of this Court's 2007 Dismissal Order specifically states the Community "may take any enforcement action available to them against any owner of Hot Lands with respect to such Hot Lands that has not executed the [UVFA]" within six months of the UVFA's enforceability date. (*GE 59*, Doc. 6596.) That is, this Court's orders specifically state the opposite of Defendants' position: the Community has the right to take any enforcement action, including filing this lawsuit, against any landowner allegedly pumping Gila River subflow who did not execute the UVFA and who did not acquire Special Hot Lands status.

Finally, even if the Gila Adjudication Court could have jurisdiction over mainstem claims, and even if Paragraph 14 were binding on this Court and constituted a valid forum-selection clause, the Court would decline to enforce it because doing so would be unreasonable and would contravene the strong public policy of maintaining the certainty and finality of the Decree and this Court's enforcement of the Decree. *See Gemini Techs.*, 931 F.3d at 914. Therefore, Defendants' Motion on this point is denied.

### 3. Estoppel

Defendants assert the Community should be "estopped from contesting the Gila Adjudication Court's jurisdiction over this dispute" because when the Community asked that court to approve the 2005 Agreement and other parties opposed it, the Community argued that while this Court has exclusive jurisdiction to enforce the Decree "as between parties" to the Decree, the Gila Adjudication Court "has the jurisdiction and mandate to make certain decisions concerning" the Decree and "to enforce the rights of all parties" to the Decree "as against the encroachment of non-parties to the [D]ecree." (Doc. 89 ep 24.) Defendants argue estoppel applies because: (1) the Community's argument the Gila Adjudication Court lacks jurisdiction over the claims here is "inconsistent" with its prior statement quoted above; (2) the Community succeeded in persuading the Gila Adjudication

Court it had jurisdiction over claims involving non-parties to the Decree, while this Court had jurisdiction over claims between parties to the Decree, as evidenced in Paragraph 14 of the 2005 Agreement; and (3) the Community would "certainly gain an unfair advantage if it is now permitted to change its position regarding the jurisdiction of the Gila Adjudication [C]ourt *after* its [2005 A]greement was approved by that court." (*Id.* ep 24–25.)

The Community argues judicial estoppel does not apply because the statement Defendants point to is "not inconsistent with the Community invoking this Court's jurisdiction in this case." (Doc. 103 ep 23–24.) According to the Community, the Gila Adjudication Court "does have jurisdiction over 'certain decisions' about Decree enforcement regarding disputes involving non-parties to the Decree, and that is not inconsistent with this Court's exclusive jurisdiction in this case." (*Id.* ep 24.) The Court agrees.

"Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). Courts consider three factors when evaluating whether to apply judicial estoppel: (1) "a party's later position must be 'clearly inconsistent' with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled'"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1045 (9th Cir. 2016) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 743 (2001)).

The earlier position at issue here appeared in the Community's response to objections to the Gila Adjudication Court's approval of the 2005 Agreement, in which the Community asserted:

> While the Globe Equity Court may have exclusive jurisdiction to enforce the provisions of the Globe Equity Decree, as between parties to that decree, the [Gila] Adjudication Court has the jurisdiction and mandate to make certain decisions concerning the Globe Equity Decree and to enforce the rights of all parties to the Globe Equity Decree as against the encroachment of non-parties to the decree.

(Def. Exh. 28 ep 6.)  The Community went on to explain Arizona law requires the Gila Adjudication Court to determine the extent and priority date of and adjudicate the water rights of the Gila River and, in so doing, must incorporate the rights adjudicated in the Decree.  (*Id.* (citing A.R.S. § 45-257(B)(1) (explaining duty of general stream adjudication courts)).)  Two paragraphs later, the Community asserted the above references to both this Court and the Gila Adjudication Court's jurisdiction "does not somehow preclude" the Gila Adjudication Court's jurisdiction and noted:  "As it has already decided, [the Gila Adjudication Court] will deal with the portions of the [2005 Agreement] that are within its jurisdiction.  The Globe Equity Court will deal with the portions of the [2005 Agreement] that are within its jurisdiction."  (*Id.* ep 7.)

Reading the Community's statement above in context, the Court concludes the Community's current position is not clearly inconsistent with its earlier position.  *See Kobold*, 832 F.3d at 1045.  The Community's earlier position acknowledges that although this Court has exclusive jurisdiction to enforce the Decree between parties to it, the Gila Adjudication Court can also make certain decisions relating to the Decree because, as the Arizona Legislature explained in A.R.S. § 45-257(B)(1), general stream adjudication courts "shall accept the determination of [water] rights and dates of appropriation as found in" prior decrees, like the Decree here.  The Community did not assert the Gila Adjudication Court had jurisdiction over cases involving mainstem rights.  The Community's current position is this Court has exclusive jurisdiction over cases involving mainstem rights.  Acknowledging the Gila Adjudication Court can make *certain* decisions concerning the Decree and enforcing Decree rights as it relates to that court's duties set forth by the Legislature is not inconsistent with arguing this Court has exclusive

jurisdiction over cases involving mainstem claims.  Thus, judicial estoppel does not apply.  *See Kobold*, 832 F.3d at 1045.  Defendants' Motion is denied.

## B. <u>Defendants' Motion Re: Claim Preclusion</u>

Defendants argue the Community's claims are precluded because the same claims were dismissed with prejudice in a 2007 case, as required by the 2005 Agreement.  (Doc. 87 ep 4, 7, 10–16.)  The Community asserts claim preclusion does not apply because none of the instant claims could have been brought in a previous lawsuit, as the Complaint here challenges Defendants' pumping from 2016 to present.  (Doc. 101 ep 5.)  The Community also argues the 2005 Agreement "expressly recognized that dismissal with prejudice of the 2007 complaint would not bar this case."[13]  (*Id.* ep 17.)

"Res judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action."  *GP Vincent II v. Est. of Beard*, 68 F.4th 508, 514 (9th Cir. 2023) (quoting *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001)).  "Claim preclusion requires '(1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties.'"  *Howard v. City of Coos Bay*, 871 F.3d 1032, 1039 (9th Cir. 2017) (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003)).  The parties sharply dispute the first and second elements.

Courts consider four factors when evaluating whether claims are identical:  "(1) whether the rights or interests established by the prior judgment would be destroyed or impaired by prosecution of the second action, (2) whether substantially the same evidence is presented in the two actions, (3) whether the two suits involve infringement of

---

[13]The Community asserts Defendants' separate statement of facts violates Local Rule of Civil Procedure ("LRCiv") 56.1 because it "contains improper explanations, inferences, legal arguments, and/or conclusions that must be stricken or disregarded, [and] circumvents the page limits for briefing."  (Doc. 101 ep 18–19.)  The Community also argues Defendants "are not allowed" to use the materials in Exhibits 30, 38, 64, and 92 under Federal Rule of Civil Procedure 37(c)(1) because they were not properly disclosed.  (*Id.* ep 19.)  The Court largely agrees; however, these instances are harmless because those exhibits are irrelevant to the Court's resolution of the issues.

the same right, and (4) whether the two suits arise out of the same transactional nucleus of facts."  *GP Vincent II*, 68 F.4th at 515.  The fourth factor is often deemed the most important.  *See Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 918 (9th Cir. 2012).  "The rule in this circuit, and others, is that 'claim preclusion does not apply to claims that accrue after the filing of the operative complaint' in the first suit." *Media Rts. Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1021 (9th Cir. 2019) (quoting *Howard*, 871 F.3d at 1039–40).  The Ninth Circuit has read "'accrue' to mean 'come into existence' or 'arise,'" and has explained:  "claim preclusion does not apply to claims that were not in existence and could not have been sued upon—i.e., were not legally cognizable—when the allegedly preclusive action was initiated."  *Id.* (quoting *Accrue*, Black's Law Dictionary (10th ed. 2014)).  Thus, the question is whether the Community's claims accrued—i.e., came into existence or arose—and "could have been sued upon before" the 2007 case.  *Media Rts.*, 922 F.3d at 1022 (internal quotation marks and citation omitted).

The Community's claims here arise from Defendants allegedly pumping Gila River subflow without a Decree right and using that water to irrigate their lands "during one or more irrigation years from 2016 to present."  (Doc. 1 ¶¶ 37–38 (Schoebroeks), 50–54 (Sextons).)  Defendants argue the Complaint does not raise new claims simply because the Community alleges the pumping took place "from at least 2016 to present," (*Id.* ¶ 23), but rather "raises pumping in recent years only as an example of the pumping that has taken place on [Defendants' lands]."  (Doc. 87 ep 13–14.)  Defendants assert the Community's allegation the pumping has occurred "at least from 2016 to present" shows the Complaint "objects to all historical pumping" on Defendants' land.  (*Id.* ep 14.)  Defendants also contend claim preclusion "is *not* defeated where a plaintiff alleges distinct conduct 'only in the limited sense that every day is a new day, so doing the same thing today as yesterday is distinct from what was done yesterday.'"  (*Id.* (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1464 (9th Cir. 1993)).)  According to Defendants, refusing to apply claim preclusion here would allow a plaintiff to sue every year for the

exact same conduct, even if the plaintiff lost every time, and that is "exactly the kind of piecemeal litigation res judicata aims to prevent." (*Id.* ep 14 (quoting *Turtle Island*, 673 F.3d at 919).) Defendants argue this case is like *Turtle Island* and not like *Media Rights*, and there "is no authority for applying the separate-accrual rule here." (Doc. 107 ep 6.) According to Defendants, the allegedly unlawful pumping here is "merely an example of a long-standing practice allegedly not in compliance with the law," and, therefore, the claims here arise from "the same transactional nucleus of fact" as the claims in the 2007 case. (*Id.* ep 6–9.)

Assuming for the sake of argument the claims are identical, and the first element of claim preclusion is satisfied, the Court is not convinced the dismissal of the 2007 complaint satisfies the second element. In 1982, the Community filed a complaint in this court alleging thousands of landowners, including Defendants' predecessors-in-interest,[14] were unlawfully pumping Gila River subflow in derogation of the Community's Decree rights. (Doc. 88 ¶¶ 17–18; Def. Exh. 45; Doc. 102 ¶¶ 18.) In 1990, this Court stayed all claims against unlawful pumping, and, after the Arizona Supreme Court issued its decision in *In re General Adjudication of All Rights to Use Water in Gila River System & Source*, 9 P.3d 1069 (Ariz. 2000) ("*Gila IV*"), lifted the stay and directed the Community to file a new complaint on the pumping issue. The Community did so in 2001, and that new complaint ("2001 Complaint") again alleged landowners, including Defendants' predecessors-in-interest,[15] were unlawfully pumping Gila River subflow in derogation of the Community's Decree rights. (Def. Exh. 48.) The judge assigned to the case at the time held a trial on the issue of whether the Decree governs subflow pumping by parties to the Decree. (*GE 59*, Doc. 6383.) Before issuing a ruling, that judge withdrew from the case, and, in 2003, it was reassigned to Judge Bolton. (*Id.*) Shortly thereafter, the San Carlos Irrigation and

---

[14]Mary Lunt & Sons owned the Schoebroek Parcel, and Walter Doyle Sexton owned the Sexton Parcels at the time. (Doc. 88 ¶ 18.)

[15]Larry W. Barney owned the Schoebroek Parcel (Def. Exh. 48 ep 24; *GE 59*, Doc. 5053, Exh. A at 14) and the defendant listed as "Sexton Doyle" owned the Sexton Parcels at the time (Def. Exh. 48 ep 25; *GE 59*, Doc. 5053, Exh. A at 15).

Drainage District and the San Carlos Apache Tribe filed motions for summary judgment on the 2001 Complaint, which Judge Bolton granted in-part and denied in-part. (*Id.*) In so doing, Judge Bolton ruled the *Gila IV* test for determining subflow controlled:

> As a matter of law, the Court concludes that the Gila Decree governs pumping by the parties to the Decree when those parties' wells are pumping subflow and that the Arizona Supreme Court's test for subflow set out in *Gila River IV* defines for the Gila Decree when wells are pumping subflow and when they are pumping percolating ground water not governed by the Gila Decree.

(*Id.*)

As explained above, the Community entered the 2005 Agreement which included the UVFA, in which the Community agreed to "re-file . . . a complaint in a form identical" to the 2001 Complaint "except that such complaint shall not name the following parties as Defendants . . . ." (2005 Agreement at 246–47 § 25.17.1.) The Community did so and, in compliance with the 2005 Agreement, moved to dismiss that new complaint ("2007 Complaint") with prejudice. (2:07-cv-01702, Doc. 1.) The Community's motion sought to "stay the [2007 case] pending dismissal of [its] claims as contemplated by the [Arizona Water Settlements Act of 2004]" and dismiss the claims against the defendants and their successors-in-interest "with prejudice effective on the Enforceability Date (as defined in the [Arizona Water Settlements Act of 2004])." (2:07-cv-01702, Doc. 5 ep 2–3.) The Court granted the motion, thus staying the action, and terminated the action after the 2005 Agreement's enforceability date. (2:07-cv-01702, Doc. 23.)

Defendants argue the dismissal of the 2007 Complaint with prejudice "constituted a final judgment on the merits for claim preclusion purposes" because: (1) claim preclusion applies "even if there has been no litigation of the issues" (quoting *Marin v. HEW, Health Care Fin. Agency*, 769 F.2d 590, 593 (9th Cir. 1985)); (2) "authorities agree that a dismissal 'with prejudice' is 'interchangeable' with a 'final judgment on the merits'" (quoting *Stewart v. U.S. Bancorp*, 297 F.3d 953, 956 (9th Cir. 2002)); and (3) the order dismissing the 2007 Complaint "did not contain any exceptions that would allow the

Community to refile the action."   (Doc. 87 ep 17.)   Defendants further assert the Community specifically sought dismissal of the 2007 Complaint against not only the named defendants in the case, but also their successors-in-interest and the Community assured those parties they were protected from prejudice because of claim preclusion.  (*Id.*)

In response, the Community argues Defendants' characterization of the 2007 Complaint dismissal "not only runs afoul of claim preclusion principles, but also is refuted by" the 2005 Agreement, which "*preserved* future claims for Decree enforcement against those who, like the Defendants, failed to qualify for Special Hot Lands status."  (Doc. 101 ep 17.)   The Community points to ¶ 4.9.2 of the UVFA, which provides:  "Except for acts . . . that are In Compliance with this Agreement," the Community "shall retain any right to" "assert claims for injuries to, and seek enforcement of, [its] respective rights under [] the Globe Equity Decree."  (*Id.* ep 17–18; *GE 59*, Doc. 6482 at 33.)   The Community again notes the UVFA provided a procedure whereby Hot Lands owners, including Defendants' predecessors-in-interest, could have signed the UVFA and acquired Special Hot Land status, and argues that because Defendants' predecessors-in-interest did not do so, "their conduct is inconsistent with the [2005] Agreement and falls squarely within the Community's retention of rights under Paragraph 4.9.2 and 4.9.4 of the UVFA."  (*Id.* ep 18.)   According to the Community, when it filed and dismissed the 2007 Complaint, Defendants "had a clean slate and a six-month window to sign the UVFA and seek Special Hot Lands status," and their failure to do so and their continued pumping of Gila River water without Decree rights "occurred after the 2007 Complaint was filed."  (*Id.*)   Last, the Community contends the reservations of rights in the UVFA recognized dismissal with prejudice was required by § 25.17.1 of the 2005 Agreement, but did not make Defendants immune from being sued for their subsequent conduct.  (*Id.*)

In reply, Defendants argue the 2005 Agreement does not allow this lawsuit because neither they nor their predecessors-in-interest were parties to it or its exhibits, including the UVFA. (Doc. 107 ep 9.) Defendants note their predecessors-in-interest were, however, named in the 2007 Complaint, so they argue claim preclusion "flows from that dismissal,

not the [2005] Agreement itself." (*Id.*)  Defendants assert the Community has provided no authority for the proposition that the terms of the 2005 Agreement "insulate [the Community] from the legal effect of the dismissal with prejudice as to non-parties to the [2005] Agreement" and note the dismissal order itself did not include any exceptions related to Defendants.  (*Id.*)  Defendants also argue the reservation-of-rights sections in both the 2005 Agreement and the UVFA are limited by the waiver-and-release sections in those documents, which they assert are "unrelated" to the dismissal with prejudice under § 25.17.1.  (*Id.* ep 9–10.)  Defendants further argue the Community's position contradicts its representations at the time of the dismissal because, in its motion to dismiss the 2007 Complaint, the Community said the 2005 Agreement would eliminate litigation for all parties and the defendants named there would not be prejudiced because the dismissal with prejudice would ensure the claims could not be reasserted.  (*Id.* ep 10.)

Although a dismissal with prejudice generally constitutes a final judgment on the merits, *Stewart*, 297 F.3d at 956, the dismissal here must be read in context.  The Community only dismissed the 2007 Complaint with prejudice because of the 2005 Agreement.  The Community specifically stated it was moving to dismiss its claims pursuant to the Arizona Water Settlements Act (the "Act"), which approved and implemented the 2005 Agreement.  Pub. L. No. 108-451 § 207(c)(1)(G), 118 Stat 3478 (December 10, 2004).  (2:07-cv-01702, Doc. 5 ep 2.)  When the Community moved to dismiss the 2007 Complaint, it explained under the framework of the Act, "the Community will only receive the material benefits provided therein if the signatory and non-signatory settlement beneficiaries receive the benefit of the waivers that are also authorized by the Act."  (*Id.* ep 7.)  The Community further explained, "dismissal of certain pending and previously-filed lawsuits, constitutes one of the principle means for memorializing and formalizing the waiver of these claims," and refers specifically to ¶ 25.17.1 of the 2005 Agreement.  (*Id.* ep 7–8.)  In like manner, the Order granting dismissal states: "the above-captioned proceeding is stayed pending dismissal of the [Community's] claims as *contemplated by the Arizona Water Settlements Act*."  (2:07-cv-01702, Doc. 23 (emphasis

added).)  Thus, the Court cannot ignore the 2005 Agreement or the Act in evaluating the dismissal of the 2007 Complaint.

The Court finds Defendants' arguments about the 2005 Agreement and UVFA unavailing.  As explained above in Section IV(A)(2) of this order, the Community made no promises to not sue owners of Hot Lands who did not acquire Special Hot Lands status under the UVFA.  The UVFA was intended to settle the then-existing claims by giving non-Decree owners of Hot Lands six months to attempt to obtain Decree rights to comply with the UVFA.  Defendants do not dispute neither they nor their predecessors-in-interest attempted to do so, and they do not argue they are otherwise complying with the UVFA. To ignore the terms of the UVFA which facilitated the dismissal of the 2007 Complaint would be contrary to the text and purpose of the UVFA and the Act.  Additionally, to do so would not only give the benefit of the UVFA to Defendants, who did not attempt to comply with it, but would insulate all other Hot Lands owners named in the 2007 Complaint from Decree enforcement actions, thus allowing potentially unlawful use of Gila River water in derogation of not just the Community's Decree rights, but the rights of other Decree parties into perpetuity.  This the Court will not do.

Given the order dismissing the 2007 Complaint, and the underlying motion's express references to the UVFA and the UVFA's express terms outlined above, the Court concludes the 2007 dismissal does not preclude the Community's claims here.  Further, even if the claim-preclusion elements were met here, the Court notes claim preclusion is an equitable doctrine for which there are exceptions.  *See* Restatement (Second) of Judgments § 28 (1982) ("Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded" under certain circumstances.); *see also V.V.V. & Sons Edible Oils Ltd. V. Meenakshi Overseas, LLC*, 946 F.3d 542, 545 (9th Cir. 2019) (applying Restatement exception to claim preclusion).  When "[t]here is a clear and convincing need for a new determination of the issue [] because of the potential adverse impact of the determination on the public interest," claim preclusion

1   does not apply.  *See* Restatement (Second) of Judgments § 28 (1982).  Considering the

2   increasing scarcity of water in Arizona, the Court concludes there is a clear and convincing

3   need for a new determination of whether Defendants are unlawfully using Gila River water

4   because allowing Defendants to continue their allegedly unlawful use would have an

5   adverse impact on the public interest.  *See id.*  Accordingly, Defendants' motion for

6   summary judgment on claim preclusion is denied.

7                        **C. <u>Plaintiffs' Motion for Summary Judgment</u>**

8           Plaintiffs argue the undisputed material facts show Defendants are pumping subflow

9   without Decree rights.   (Doc. 78 ep 7.)   Plaintiffs also argue Defendants' 85-page

10  Controverting Statement of Facts[16] "must be stricken or disregarded because it includes

11  '[o]pinion, suggested inferences, legal arguments and conclusions,' which 'are not the

12  proper subject matter of a Local Rule 56.1 statement."  (Doc. 100 ep 24 (quoting *Breeser*

13  *v. Menta Group, Inc., NFP*, 934 F. Supp. 2d 1150, 1155 (D. Ariz. 2013).)  As Plaintiffs

14  correctly note, "[w]hen analyzing Local Rule 56.1(b) statements . . . courts are not required

15  to wade through improper denials and legal argument in search of a genuinely disputed

16  fact." *Breeser*, 934 F. Supp. 2d at 1155 (cleaned up).  Statements of fact are fact statements

17  designed to "assist the court by organizing the evidence, identifying undisputed facts, and

18  demonstrating precisely how each side proposes to prove a disputed fact with admissible

19  evidence." *Id.*  (citation omitted).   Therefore, opinions, suggested inferences, legal

20  arguments and conclusions are improper. *Id.*; *see also Alozie v. Ariz. Bd. Of Regents*, 431

21  F. Supp. 3d 1100, 1105, n.2 (D. Ariz. 2020).

22          Indeed, much of Defendants' Controverting Statement of Facts contains immaterial

23  disputes or lengthy legal arguments couched as disputes.  (*See, e.g.*, DCSOF ¶¶ 13–19.)

24  The Court will not strike Defendants' Controverting Statement of Facts, but "disregards

25  those disputed facts which are immaterial to resolving these motions" and "also disregards

26  the arguments, framed as disputes, which are presented in the controverting statement of

27  _____

28          [16]Defendants' "Response to [the] Community's Statement of Material Facts," which
    the Court construes as Defendants' Controverting Statement of Facts ("DCSOF"), *see*
    LRCiv 56.1(b), is docketed at item 86, pages 3–65, in the electronic record.

facts in violation of Local Rule of Civil Procedure 56.1(b)."  *Alozie*, 431 F. Supp. 3d at 1105, n.2.

To the extent Defendants raise hearsay objections to the expert reports cited by Plaintiffs, these objections fail.  Defendants cite *Ariz. Dep't of Law, Civ. Rts. Div. v. ASARCO, L.L.C.*, 844 F. Supp. 2d 957, 965, 2011 WL 7414565 (D. Ariz. 2011), for the proposition that "[e]xpert reports constitute inadmissible hearsay."  (Doc. 86 ep 2.) Although they acknowledge Plaintiffs "may be able to present similar evidence as the contents of its expert reports at trial in admissible form, it did not do so here."  (*Id.* ep 3.) Rule 56(c) provides:  "A party may object that the material cited to support or dispute a fact cannot be presented in a form *that would be admissible in evidence*."  However, "[t]he 2010 amendments to Rule 56 eliminated the requirement that evidence be authenticated and admissible in its present form to be considered at the summary-judgment stage, instead requiring only that the substance be admissible at trial."  *Pacesetter Consulting LLC v. Kapreilian*, CV-19-00388-PHX-DWL, 2021 WL 3168471, at \*3, n.3 (D. Ariz. July 27, 2021).  Therefore, Defendants' objections are unfounded and are overruled.

### 1.  Undisputed Facts

Defendants do not have Decree rights.  (PSOF[17] ¶ 13; DCSOF ¶ 13.)  Defendants' four wells at issue are and have been pumping water, which they are and have been using to irrigate their farmland from at least 2016 to 2021.  (PSOF ¶¶ 1–3 (Schoebroek), 5–7 (Sextons); DCSOF ¶¶ 1–3, 5–7.)

Defendants hired Clear Creek Associates ("CCA") to determine the sources of water pumped by their four wells at issue.  (PSOF ¶¶ 14–15; DCSOF ¶¶ 14–15; Def. Exh. 14 ("CCA Report") ep 10.)  CCA's report did not specifically delineate a subflow zone or the

---

[17]Plaintiffs' "Statement of Material Facts" in support of their Motion for Summary Judgment ("PSOF") is docketed at item 79 in the electronic docket.

extent of the floodplain Holocene alluvium ("FHA").[18]  (DAMF[19] ¶ 58; Def. Exh. 13 ¶ 18.)  Rather, CCA developed a subsurface water flow model for the area surrounding Defendants' wells, the purpose of which was to simulate subsurface water flow and to track water that infiltrates the ground from the Gila River, tributaries, or irrigation recharge (i.e., water applied to the farmland that infiltrates back into the ground).  (PSOF ¶¶ 14–15; DAMF ¶¶ 46–47; Def. Exh. 13 ¶¶ 5, 7.)  The CCA model "tagged" sources of water with a numerical value "to determine the percentage of water that was reaching the well directly from the Gila River."  (Plaintiffs' Exhibit ("Pl. Exh.") 9, Doc. 79-2 ep 11.)  CCA assigned water "entering the aquifer directly from the Gila River" a value of "one," and assigned "[a]gricultural irrigation water and tributary groundwater" a value of "zero."  (*Id.*)  By tagging these water sources with those values, the model predicted how those sources would mix over 100 years, as well as from 2008–2019 specifically, and the results were "used to assess each irrigation well in this case with respect to the fraction of tagged water versus water derived from the Gila River."  (*Id.*)  The CCA Report concluded, based on those results, that Sexton Well 3 is not drawing any Gila River water, while the water being drawn by the other Sexton Wells 1 and 2 is, on average, 2.64% and 2.10% Gila River water and the Schoebroek Well's water is, on average, 0.56% Gila River water.  (*Id.*; Doc. 79-4 ep 3.)  The depositions of Defendants' expert, Doug Bartlett of CCA, and Vivek Bedekar also confirms this.  (Def. Exh. 8 ("Bartlett Depo."); Pl. Exh. 10 ("Bedaker Depo.").)

Plaintiffs assert it is undisputed Defendants' experts, Bartlett and Paul Plato of CCA "concluded that some of the water pumped from" the Schoebroek Well, Sexton Well 1, and Sexton Well 2 "travels from the surface flow of the Gila River to the wells."  (Doc. 78

---

[18]"'Holocene' refers to the Holocene epoch, which is that part of the Quaternary period that covers approximately the most recent 10,000 years.  During that time frame, floods caused rivers to carry and deposit certain materials that originated from erosion of bedrock and basin fill deposits.  The 'Holocene alluvium,' also referred to as the younger or floodplain alluvium, is the sedimentary material in a river valley that resulted from that process."  *Gila IV*, 9 P.3d at 1069, n.2 (citing American Geological Institute, *Glossary of Geology* 17, 301 (Julia A. Jackson, ed., 1997)).

[19]Defendants' "Statement of Additional Material Facts" ("DAMF") is docketed at item 86, pages 65–84 in the electronic record.

ep 19; PSOF ¶¶ 16–18.)  Defendants dispute the phrase "from the surface flow of the Gila River" because "it incorrectly implies that the [Defendants' wells] pump[] water that travels directly from the surface flow of the river to the well as it is being pumped." (DCSOF ¶¶ 16–18.)  Defendants do not, however dispute the CCA Report shows, as to the Schoebroek Well, "only approximately 0.56% of the pumped water (on average) originated, at some point in the past, from the Gila River—but it was pumped directly from the groundwater system."  (DCSOF ¶ 16.)  Defendants repeat this same "dispute" and objection for Sexton Well 1 and Sexton Well 2, but admit the CCA Report found "approximately 2.64%" of the water Sexton Well 1 and "approximately 2.10%" of the water Sexton Well 2 pumps originated from the Gila River.  (*Id.* ¶¶ 17–18.)  Defendants' "disputes" and "objections" to these facts are irrelevant and are not genuine.  Thus, it is undisputed the CCA Report found Sexton Well 3 is not pumping any subflow, while Sexton Wells 1 and 2 and the Schoebroek Well are pumping Gila River subflow.

## 2.  *Gila IV* Subflow Test

Because "[u]nderground waters are presumed to be percolating and, therefore, not appropriable as subflow," a party asserting underground water is part of a stream's subflow "must prove that fact by clear and convincing evidence."  *Gila IV*, 9 P.3d at 1074.  As explained above, subflow is "a purely legal, not scientific, term."  *Id.* at 1076; *supra* n.3.  As Judge Bolton explained, *Gila IV* "defined with precision the limits of subflow," and, as explained above in Section IV(B), the *Gila IV* test defines for the Decree when wells are pumping subflow or percolating groundwater.  *GE 59*, Doc. 6383 ep 5.  *Gila IV* arose from an interlocutory appeal to determine whether the Gila Adjudication Court "properly determined what underground water constitutes 'subflow' of a surface stream, thus making it appropriable under A.R.S. § 45–141(A)" when it considered subflow of the San Pedro River (a Gila River tributary).  9 P.3d at 1072, 1075.  The Gila Adjudication Court held twelve days of evidentiary hearings, during which ten experts in geology and hydrology testified and the parties presented conflicting evidence; the court also took a two-day field trip to visit thirteen sites with counsel and numerous experts, who explained the geology

and hydrology of each site. *Id.* at 1075. The court weighed the conflicting expert opinions and evidence to resolve the disputed facts and, in its 66-page order, explained "the most accurate of all the markers" for delineating the subflow zone "is the edge of the saturated [FHA]," and set forth a test for determining whether water is percolating groundwater or subflow. *Id.* at 1075–76.

The Arizona Supreme Court affirmed the Gila Adjudication Court's order in its entirety and noted: "The record reflects that the saturated [FHA] is readily identifiable; that [A]DWR[20] can quickly, accurately, and relatively inexpensively determine the edge of that zone; and that some of the work already has been done." *Id.*, 9 P.3d at 1081. The *Gila IV* Court held:

> The entire saturated [FHA], as found by [A]DWR, will define the subflow zone in any given area. In the effort to determine that zone in other areas, the detailed criteria set forth in the trial court's order, insofar as they apply and are measurable, must be considered, but we do not preclude the consideration of other criteria that are geologically and hydrologically appropriate for the particular location.

*Id.*; *see also GE 59*, Doc. 6383 at 5 (adopting this definition).

The *Gila IV* Court also agreed with the Gila Adjudication Court's conclusion that if a well is within the lateral limits of the subflow zone, it is presumed to be pumping subflow; if it is outside the subflow zone, it is presumed not to be pumping subflow. 9 P.3d at 1077, 1092. However, even if a well is outside the lateral limits of the subflow zone, "[A]DWR may seek to establish" it "is in fact pumping subflow . . . by showing that the well's cone of depression[21] extends into the subflow zone and is depleting the stream." *Id.* at 1082.

---

[20]The Arizona Department of Water Resources ("ADWR") is the technical advisor to the state court in state general stream adjudications. *See* A.R.S. §§ 45-252, 45-256 (ADWR must, when requested, identify the hydrological boundaries of a river system and all potential claimants, make available all relevant public records, generally investigate and examine the river system, make a map of the river system, and do whatever else is necessary for "a proper determination of the relative rights of the parties" to the adjudication.).

[21]"The cone of depression is the funnel-shaped area around a well where the

- 30 -

The *Gila IV* Court did not establish a test for determining a well's cone of depression and neither did the Gila Adjudication Court in that case because it "lacked pertinent evidence on that issue." *Id.* The *Gila IV* Court did, however, conclude that "although a cone of depression may result in only part of a well's production being appropriable subflow," that well is subject to appropriation. *Id.* The *Gila IV* Court explained: "When [A]DWR determines and establishes that a well is in the subflow zone by using the pertinent criteria or that it is pumping subflow by reason of its cone of depression, [A]DWR provides clear and convincing evidence of that fact." *Id.* The burden then shifts to the well owner to show by a preponderance of the evidence that the well is outside the subflow zone or is not pumping subflow to rebut the presumption that the well is pumping subflow. *Id.*

### 3. Applying *Gila IV* Test Here

Because Defendants' own expert reports determined the Schoebroek Well, Sexton Well 1, and Sexton Well 2 are pumping subflow, the Court concludes clear and convincing evidence shows those wells are pumping subflow. Therefore, the burden shifts to Defendants to rebut that by a preponderance of the evidence. However, because the CCA Report determined Sexton Well 3 is not pumping any subflow, Plaintiffs bear the burden of establishing by clear and convincing evidence that Sexton Well 3 is in the subflow zone or is pumping subflow because of its cone of depression.

### i. *Whether ADWR Must Delineate the Subflow Zone Here*

ADWR has not delineated the subflow zone here. Defendants argue "[o]nly ADWR's delineation of the subflow for the Gila River will constitute clear and convincing evidence to rebut the presumption that Defendants' wells are pumping percolating groundwater" and Plaintiffs "cannot meet this burden because [their expert]'s delineation is not sufficient." (Doc. 85 ep 14.) Plaintiffs argue Defendants are wrong because this Court has exclusive jurisdiction to protect the Gila River mainstem from illegal diversions by "using state substantive law adapted to the Decree" and can delineate the subflow zone

---

withdrawal of groundwater through the well has lowered the water table." *Gila IV*, 9 P.3d at 1081, n.9.

using the *Gila IV* test.  (Doc. 100 ep 6.)  Plaintiffs further assert ADWR lacks authority over the mainstem waters and the "technical assistance" ADWR provides to the Gila Adjudication Court is pursuant to A.R.S. § 45-256, which does not apply here.  (*Id.* ep 7.) Plaintiffs also contend ADWR is not "a kind of impartial arbiter," because the Gila Adjudication Court is who decides subflow issues in adversarial litigation, and ADWR's views are often challenged and rejected in favor of the litigating parties' positions.  (*Id.*)

In essence, Defendants' position is the Court should strictly interpret the Arizona Supreme Court's language that the subflow zone is "the entire saturated [FHA], as found by [ADWR]," *Gila IV*, 9 P.3d at 1081, and therefore should wait an undetermined amount of time for ADWR to delineate the saturated FHA—which could easily be decades given how long it took ADWR to delineate the San Pedro subflow zone in *Gila IV*.  In contrast, Plaintiffs' position is this Court should apply the criteria and test used by the Gila Adjudication Court and approved by the Arizona Supreme Court in *Gila IV*.

First, the Court rejects Defendants' assertion this Court must wait for ADWR to "eventually" "undertake th[e] process for the Gila" to delineate the subflow zone.  (Doc. 85 ep 14, 25.)  Because water is a "very precious and limited commodity in Arizona," *Gila IV*, 9 P.3d at 1074, is becoming increasingly scarce, and the Gila Adjudication, as explained in Section IV(A)(1), is uniquely long and complex with no end in sight, this Court will not wait for ADWR to "eventually" do it.[22]

Second, the Court rejects Defendants' contention only ADWR has the authority to delineate the subflow zone.  *Southwest Cotton* explained that because of the presumption that underground waters are percolating in their nature, "*He* who asserts that they are not must prove his assertion affirmatively by clear and convincing evidence."  4 P.2d at 376 (emphasis added).  *Gila IV* affirmed this by stating: "*One* who asserts that underground

---

[22]Defendants' Second Notice of Supplemental Authority filed one week before oral argument includes a report in which ADWR recommends the Gila Adjudication Court set a deadline for a subflow zone report of the Upper and Middle Gila Watershed for "no earlier than June 2036."  (Doc. 129-1 ep 17.)  This only bolsters the Court's conclusion that waiting for ADWR to delineate the subflow zone is unreasonable.

water is a part of a stream's subflow must prove that fact by clear and convincing evidence." *Gila IV*, 9 P.3d at 1074 (emphasis added). That case then quoted *In re General Adjudication of All Rights to Use Water in Gila River System & Source*, 857 P.2d 1236, 1246 (1993) ("*Gila II*"), to say: "If [A]DWR uses the proper test and relies on appropriate criteria for determining whether a well meets the test, its determination that a well is pumping appropriable subflow constitutes clear and convincing evidence." *Gila IV*, 9 P.3d at 1074. None of these cases say only ADWR can prove by clear and convincing evidence a well is pumping subflow or delineate the subflow zone. Indeed, *Gila IV* expressly uses "one"—not ADWR. Both *Gila II* and *Gila IV* explain that *if* ADWR uses the proper test and relies on the proper criteria to determine if a well is pumping subflow, *then* its determination of such will constitute clear and convincing evidence. Defendants point to no authority giving ADWR the sole authority to delineate the subflow zone or excluding non-ADWR parties from meeting that standard if they, too, use the proper test and rely on the proper criteria. Indeed, the Gila Adjudication Court in the case underlying *Gila IV* considered the *parties'* evidence and competing experts, including experts who did not work for ADWR. *See Gila IV*, 9 P.3d at 1075–79. The Arizona Supreme Court expressly noted the groundwater users' argument on appeal "largely boil[ed] down to a disagreement with the trial court's resolution of disputed facts and conflicting expert opinions," and it is the trial court's province to "weigh[] the evidence and resolve[] any conflicting facts, expert opinions, and inferences therefrom." *Id.* at 1079. In other words, it is the trial court that decides the subflow zone. Although ADWR will most often be the entity that undertakes the task of delineating subflow zones of the Gila River tributaries (because it is the Gila Adjudication Court's technical advisor by statute), there is no authority prohibiting the use of a non-ADWR proposed subflow delineation so long as the Court concludes the proper test was used and the proper criteria were relied upon.

Third, the Court concludes a full delineation is unnecessary in this case because, as explained below, there is no genuine dispute Defendants' wells are either pumping some amount of subflow or are within the lateral limits of the FHA.

1

2                      *ii.      Whether Sexton Well 3 is in the Subflow Zone*

3        Plaintiffs assert the undisputed facts show Sexton Well 3 pumps subflow because,

4 "*[n]o matter how the subflow zone boundary is drawn*, the three Sexton Wells are in the

5 subflow zone."  (Doc. 100 ep 11.)  Defendants repeat their argument that because ADWR

6 has not delineated the subflow zone, there is not clear and convincing evidence that Sexton

7 Well 3 is within the subflow zone, and they assert Plaintiffs' proposed subflow zone

8 delineated by their expert, Dr. Mock, is "not sufficient" because Mock "did not delineate

9 the subflow zone in the manner as ADWR and as prescribed by *Gila IV*" and his delineation

10 "d[id] not follow the Adjudication processes."  (Doc. 85 ep 27.)  Specifically, they argue

11 Mock's delineation is lacking because:  (1) Mock conducted no field work, described his

12 only site visit as a "formality," and testified he had already begun to draw his subflow line

13 before visiting, so he "blindly applied procedures developed for the San Pedro River

14 without any additional investigation"; (2) Mock "did not properly account for tributary

15 aquifers" and did not identify where the tributary aquifers are located, in contrast to

16 Defendants' expert, Dr. Lipson, who walked along the tributaries and concluded Mock's

17 line arbitrarily cuts through tributaries, thus failing to properly account for aquifers;

18 (3) Mock's delineation "is based on geologic mapping that has not been approved by the

19 Adjudication as appropriately mapping the FHA"; and (4) Mock's delineation "deviates

20 from ADWR's process because he extended the FHA to the bounding outcrops or 'bluffs'

21 surrounding the river, which is a method that has been expressly rejected multiple times by

22 Arizona courts."  (*Id.* ep 27–29.)  Defendants also assert Plaintiffs "failed to conduct any

23 independent investigation into whether the alleged FHA underneath the Defendants'

24 parcels is saturated," and the presumption of saturation adopted in Arizona courts is not

25 appropriate here.  (*Id.* ep 29–30.)

26        Although Defendants correctly note the CCA Report did not delineate the subflow

27 zone here and Defendants' dispute the accuracy of Mock's proposed subflow zone, as

28 noted, delineation of the entire subflow zone is not necessary to resolve the issue of whether

Sexton Well 3 is in the subflow zone.  The Court need only determine whether clear and convincing evidence shows Sexton Well 3 is in the subflow zone.

One of the CCA Report authors, Bartlett, agreed in his deposition the three Sexton wells are located within the FHA:

> Q:    So the—the three Sexton wells are located in the Gila River Holocene—the [FHA], but the Schoebroek well was not located in the [FHA] of the Gila River.  That's your conclusion, right?
> A:    That's our interpretation, yes.

(PSOF ¶¶ 33–35; Bartlett Depo. at 36:21–25.)  Defendants attempt to create a dispute here by arguing neither Mock nor CCA delineated the subflow "in the appropriate manner that would meet the clear and convincing standard of evidence because ADWR is the entity who must delineate the FHA." (DCSOF ¶ 35.)  As noted above, the Court rejects the notion that only ADWR can delineate the FHA.  The Court also notes this argument in Defendants' Controverting Statement of Facts is improper and, therefore, will not be considered.  *See Breeser*, 934 F. Supp. 2d at 1155; LRCiv 56.1(b).  Defendants argue there is a dispute of material fact as to "whether there are localized confining layers at these wells" and assert Bartlett "testified that the CCA model did not include any confining layers only because he could not conclude with sufficient certainty that there was a large-scale (i.e., valley-wide) confining layer that would make it appropriate to insert such a layer into a valley-wide model."  (Doc. 85 ep 31.)  While that may be true, nowhere in their lengthy Controverting Statement of Fact ¶ 35 or their Response to Plaintiff's Motion do Defendants dispute Bartlett agreed all three Sexton Wells—including Sexton Well 3—are located within the FHA.  Rather, their argument here is about "whether there are localized confining layers" at the Sexton Wells, which means there is a dispute as to whether the wells are hydraulically connected to the stream or its subflow—this is immaterial to whether Sexton Well 3 is located within the lateral limits of the FHA.  Therefore, the Court finds the fact Sexton Wells 1, 2, and 3 are located within the lateral limits of the FHA is undisputed.

What appears to be disputed, however, is whether the FHA is saturated or not.  This

matters because *Gila IV* defined the subflow zone as "[t]he entire *saturated* [FHA]."  9 P.3d at 1081 (emphasis added).  So, if the FHA is saturated, then Defendants' expert has conceded Sexton Well 3 is located within the subflow zone.

As Plaintiffs note, in the Gila Adjudication, Judge Ballinger adopted a "saturation assumption" proposed by ADWR whereby the FHA is assumed to be saturated.  *See Gila Adjudication*, Order filed Sept. 28, 2005 ("2005 Ballinger Order").  There, ADWR recommended the Gila Adjudication Court assume, for jurisdictional purposes, the entire FHA is saturated.  *Id.* at 8.  ADWR explained, "[a]n accurate determination of the saturated portion of [FHA] is impractical" for the following reasons: (1) difficulties "in defining the thickness" of the FHA; (2) the "general lack of detailed and long-term water level data from the floodplain"; and (3) the "dynamic nature" of the floodplain aquifer system.  *Id.* at 12.  Judge Ballinger adopted ADWR's suggestion over the objections of the Special Master and objecting parties, and concluded the saturation presumption was "reasonable, practical, and consistent with the goal of permitting this adjudication to be completed within the lifetime[s] of some of those presently working on the case (or at least their children's)."  *Id.* at 13, 17 (cleaned up).  That is, the Gila Adjudication Court presumes the entire FHA is saturated and requires ADWR to presume the entire FHA is saturated.  *Id.*; *see also In re Subflow Technical Report, Verde River Watershed*, Special Master Susan Ward Harris (Nov. 27, 2017) (directing ADWR to "assume that the entire lateral extent of the [FHA] is saturated" when delineating subflow zone of Verde River Watershed).

Defendants argue the presumption is "inappropriate here" because Judge Ballinger "only made the 'presumed saturated' ruling . . . because the 'determination of the subflow zone does not adversely affect substantive rights of surface or groundwater users.  It merely sets parameters with respect to the Court's water use inquiry," and Plaintiffs are attempting to adversely affect Defendants' substantive rights here.  (Doc. 85 ep 29–30 (citing 2005 Ballinger Order at 16).)  That is, Defendants assert the saturation presumption "only results in a jurisdictional finding as to a well."  (*Id.* ep 30.)  Defendants also argue Plaintiffs "must prove to a clear and convincing degree that the FHA is saturated at Defendants' wells."

(*Id.*)  Defendants further assert even if the presumption applies, "there are confining clay layers in the area of Defendants' wells, rebutting any presumption that any FHA near the Defendants' wells is saturated," and "Defendants' experts will testify that the FHA at Defendants' wells, if it exists, is unlikely to be saturated."  (*Id.*)

Plaintiffs argue the saturation presumption applies here "as a matter of law" and Judge Ballinger "accepted ADWR's bright-line assumption of saturation because subflow is a 'purely legal' concept" and because of the need for the adjudication to be "completed within the lifetimes of some of those presently working on the case."  (Doc. 100 ep 13 (quoting 2005 Ballinger Order at 17).)  Plaintiffs also assert the jurisdictional terminology "reflects that the jurisdiction of the Gila Adjudication is limited to *appropriable* water" and a determination of whether a well should be in the adjudication because it is located within the FHA "does not in itself change substantive rights because before the well is adjudicated, the owner has the opportunity to refute jurisdiction by showing that the well is pumping from beneath an impermeable layer and therefore is not hydraulically connected to the stream or its subflow."  (*Id.* ep 14.)  Plaintiffs further argue Defendants have had the opportunity here to show their wells are not hydraulically connected to the Gila River mainstem or its subflow, but the "undisputed evidence shows hydraulic connection between" them.  (*Id.*)

The Court agrees with Judge Ballinger's assessment that the saturation presumption is reasonable and practical.  Again, given the increasing scarcity of water, the Court also agrees the saturation presumption is consistent with the goal of not just the Gila Adjudication, but of water-rights litigation and the management of water in general.  The Court further notes the saturation presumption was proposed and recommended by ADWR—the same entity Defendants strenuously insist this Court should defer to for delineating the subflow zone.  Defendants cannot, on the one hand, urge this Court to defer to ADWR for delineating the subflow zone and, on the other hand, contend this Court should reject ADWR's presumption it uses when delineating the subflow zone.  As to Defendants' contention the presumption was only applied to address a jurisdictional issue,

1   the Court agrees but finds this point irrelevant.[23]  By assuming the entire FHA is saturated

2   as the Gila Adjudication Court has directed ADWR to do, the Court concludes the subflow

3   zone here is the entire FHA.  There is no dispute Defendants' wells are all within the lateral

4   limits of the FHA, which is presumed to be saturated; accordingly, clear and convincing

5   evidence from Defendants' own experts shows Defendants' wells are located within the

6   lateral limits of the subflow zone, so they are presumed to be pumping subflow.

7               *iii.     Whether Defendants Have Shown Wells Are Not*
                *Pumping Subflow*
8

9        Next, it is Defendants' burden to show by a preponderance of the evidence the wells

10  are not pumping subflow.  In other words, Defendants must show it is more likely than not

11  their wells are pumping only percolating groundwater and not subflow.  Defendants assert

12  they have done so because "there is a dispute of material fact as to whether there are

13  localized confining layers at [their] wells."  (Doc. 85 ep 31.)  First, they note Bartlett

14  testified the CCA model did not include any confining layers because he could not

15  conclude with sufficient certainty there was a large-scale confining layer across the valley,

16  but there may be localized confining layers at individual wells.  (*Id.*)  Second, Defendants

17  point to Lipson's testimony and the drill logs for Sexton Well 3 and the Schoebroek well,

18  which "clearly state that clay layers were encountered during the drilling of those wells"

19  and support Lipson's conclusion "that there are clay layers at the locations of ***all four*** of

20  Defendants' wells, which act as [] confining layers" so as to show those wells are

21  permissibly pumping percolating groundwater from below the Gila River's subflow.  (*Id.*

22  ep 32.)

23       Plaintiffs argue Defendants' expert opinions about whether Defendants' wells are

24  pumping from deeper than the FHA "are legally irrelevant (in addition to being wrong)"

25  ───────────────

26  [23]The saturation presumption is only relevant to step one of the *Gila IV* subflow test:
    by assuming the entire FHA is saturated, the entire FHA is deemed the subflow zone—that
    determination results in a finding that a well is either in the subflow zone or is not.  In other
27  words, the saturation presumption only results in a determination of whether a well is
    presumed to pump subflow or not.  This does not affect a well owner's ability to rebut that
28  presumption under the next step of *Gila IV*.

because "[w]hat matters under *Gila IV* is whether the owners of wells within the lateral limits of the FHA show they are *not* connected to the river." (Doc. 100 ep 15.) Plaintiffs assert there is no genuine dispute, as CCA's model shows "a high degree of hydraulic connection here." (*Id.*) Plaintiffs also contend Defendants do not dispute Mock's depletion test "shows hydraulic connection" between the wells and the river. (*Id.* at 15–16.) According to Plaintiffs, Defendants' reliance on Lipson's declaration about "localized" clay layers is a "word game" because, taking the record as a whole, it is undisputed "the 'localized' presence of something labeled 'clay' in a single well log does not show a lack of hydraulic connection between the well and the river," as Bartlett testified any clay layers in the area "are relatively thin and interspersed with sands and gravels," so they do not form a confining layer. (*Id.* ep 16–17.) Plaintiffs further assert Lipson's testimony is inadequate to show Defendants' wells are not connected to the river for several reasons, which the Court addresses below.

Defendants hired Lipson to opine about the proper method for delineating the subflow zone, whether Plaintiffs' expert, Mock, followed the proper methodology in his report, and whether there is "any information to suggest where the proper subflow zone boundary may be located." (Def. Exh. 75 at 4.) Lipson reviewed 29 well logs in the area and, based on those logs, concluded there are "clay layers" which he believes are "lake bottom deposits that formed during cooler, wetter glacial periods" "like the geology that has been found in the Safford Valley." (*Id.* at 19.) As to the wells at issue here, Lipson reviewed the logs for the Schoebroek Well and Sexton Well 3, and noted similar logs do not exist for Sexton Well 1 and Sexton Well 2. (*Id.* at 20–21.) Lipson opined "[t]here is no FHA at the location of the Schoebroek" Well and "FHA may be present" at Sexton Well 3, "but the FHA is dry and has a maximum thickness of 30 feet." (*Id.*) Based on these two logs, Lipson believes "there are likely clay layers" at Defendants' wells, "which act as confining layers." (DAMF ¶¶ 40–43; Def. Exh. 79 ¶¶ 14–19.) However, at his deposition, Lipson also acknowledged he did not evaluate whether the clay layers he suggests may exist are continuous across the area, and he acknowledged that if a clay layer is not

continuous across the area, there may be a "testable, measurable connection" among the various layers, including the non-clay layers that are hydraulically connected to the FHA. (Pl. Exh. 28 at 69:7–19.)

As noted above, Defendants hired CCA to "determine the sources of groundwater pumped by [Defendants'] wells."[24]  (CCA Report, Doc. 92-14 ep 10.)  Bartlett of CCA testified at his deposition that, millions of years ago, there were periodic lakes in the Duncan Valley (where Defendants wells are located) which would have "deposited more thin clay deposits when they visited," as compared to the long history of a lake in the Safford Valley.  (Bartlett Depo. at 6:24–7:4, 19:16–20:4.)  He also said, based on the logs for the wells at issue here, "these clays are relatively thin and interspersed with sands and gravels," so "in terms of a confining layer like what's in Safford Valley, there isn't something equivalent to that in Duncan Valley."  (*Id.* at 20:4–8.)  This is consistent with the CCA Report, which states the "groundwater aquifer is characterized by unconsolidated alluvial fill materials," "a significant clay deposit has not been encountered in any wells constructed in the Study Area that would act as a regional confining unit," "[a]ll of the wells involved in this case are constructed in unconsolidated alluvial sediments," and "neither clay nor bedrock were encountered in any of the wells."  (CCA Report ep 15.)

Defendants attempt to resolve these conflicting opinions from their experts by pointing to Bartlett's Declaration where he explains the CCA model:

> assumed that there was no impervious layer (such as a clay layer) because [CCA] could not conclude with sufficient certainty that there was a large-scale (i.e., valley-wide) confining layer that would make it appropriate to insert such a layer into a valley-wide model.  However . . . we found that

---

[24]CCA used four methods to determine the sources of groundwater, including: (1) examining the water levels and direction of groundwater flow; (2) reviewing "available geologic information to evaluate what geologic formation the wells were pumping from"; (3) examining "the water chemistry of both the Gila River and groundwater sampled from various wells"; and (4) constructing a computer model of groundwater flow, as described above in Section IV(C)(1).  (CCA Report ep 10.)  In contrast, Lipson was hired to evaluate Mock's subflow delineation and the proper method for evaluating the subflow zone.  (Def. Exh. 75 at 4.)  Thus, Lipson considered substantially less material than Bartlett.

> there may be localized confining layers at individual wells, which were not incorporated into the model.

(Def. Exh. 13 ¶ 17.)  Indeed, Bartlett said at his deposition:  "In individual wells, there were documented clay layers.  So in an individual, localized situation, you may have a confining layer.  But for the bigger picture we're looking at, we weren't going to distinguish those small, localized confining units because of the scale at which we were doing the modeling."  (Bartlett Depo. at 32:4–11.)  Bartlett, however, also testified it was difficult to draw broad conclusions from the logs because they "varie[d] a lot, and some drillers are good at it and some not," so some logs are "[h]ard to interpret."  (*Id.* at 30:17–31:6.)  Bartlett went on to agree none of the wells CCA modeled pump water from below an impermeable layer and explained CCA's model assigned each of the four wells here to either Layer 1 or Layer 2 or both, which was determined based on how deep the wells were drilled, and both Layers 1 and 2 are "connected."  (*Id.* at 33:25–37:10; CCA Report ep 38, Figures 8-2 and 8-3.)  CCA found the three Sexton wells are active in Layer 1 and all four wells are active in Layer 2, and the two layers are connected, "[s]o anything going on in Layer 1 could be reflected in Layer 2 and vice versa."  (Bartlett Depo. at 34:18–37:10.)

Most of the Defendants' briefing argues the burden "has not yet been shifted to Defendants," but the extent of their argument that they can meet their burden is based on the above testimony of their experts.  (Doc. 85 ep 32.)  Although Defendants' expert opinions suggest there "may" be localized confining layers at Defendants' wells, "the record taken as a whole could not lead a rational trier of fact" to find it is more likely than not that Defendants' wells are not pumping subflow.  *Matsushita*, 475 U.S. at 587; *see also Gila IV*, 9 P.3d at 1082.  Therefore, based on the pleadings and evidence presented, the Court concludes Defendants have not shown by a preponderance of the evidence their wells are not pumping subflow or are outside the subflow zone.  *See Gila IV*, 9 P.3d at 1082.  Thus, Plaintiffs are entitled to summary judgment.  *See Anderson*, 477 U.S. at 252 ("mere existence of a scintilla of evidence" insufficient to defeat summary judgment).

### 4.   Whether Requested Relief is Overbroad

In Claim Two of their Complaint, Plaintiffs seek an order "directing the Gila Water

Commissioner to cut off and seal the defendants' wells . . . by removing the meters from the electrical power connection to the pumps, severing the pipe leading from the pump to the irrigation delivery system, and welding a metal cap onto the pipe where it has been severed." (Doc. 1 ¶ 76; Doc. 112 ¶ 67.)  Plaintiffs argue they are entitled to such an order as a matter of law, because when the Decree has been violated, "[a] more specific, measurable harm is unnecessary."  (Doc. 78 ep 33 (quoting *GE 59*, Doc. 8113 ("2018 Bolton Order"))).

Defendants argue Plaintiffs' requested relief is "overbroad" because they have "not shown that all of the water pumped by Defendants' wells is subflow" and Plaintiffs do not have the right to stop Defendants from pumping percolating groundwater. (Doc. 85 ep 35–36.)  According to Defendants, the 2018 Bolton Order cited by Plaintiffs did not say wells pumping both percolating groundwater and subflow must be shut off no matter what percentage of the water is percolating groundwater versus subflow. (*Id.* ep 36.)  Defendants contend "[t]he regulation of wells that pump only some river water is an issue of first impression best left up to the [Gila] Adjudication Court, with the help of the ADWR's independent expertise."  (*Id.*)  That is, because Defendants' wells are pumping a mix of percolating groundwater—to which they are entitled under Arizona state law—and Gila River subflow—to which they are not entitled under the Decree, they urge this Court to wait for the Gila Adjudication Court to make a ruling about whether shutting off wells that pump any amount of subflow is the appropriate remedy.  In their Reply, Plaintiffs counter: "The Decree makes no accommodation for those depriving downstream users of Decree water by pumping, simply because an unauthorized pump happens to pull in other water." (Doc. 100 ep 20–21.)  Plaintiffs also contend Defendants "are free to follow the process for obtaining and transferring Decree rights to their parcels and to seek to have their wells authorized as points of diversion," but, in the meantime, "their wells must be disabled." (*Id.* ep 21.)

First, given the length and complexity of the Gila Adjudication proceedings and the increasing scarcity of water, the Court declines to wait for the Gila Adjudication Court to

announce a rule about how to remedy wells that are pumping both percolating groundwater and subflow.

Second, this Court has exclusive jurisdiction over issues involving the Gila mainstem, so even if this Court waited an undetermined number of years for the Gila Adjudication Court to announce such a rule, that rule would not be binding on this Court or apply to mainstem waters.

Third, as Judge Bolton explained in her 2018 Order, "[i]f unauthorized diversions are indeed taking place, the prescribed remedy is to shut them down." (2018 Bolton Order at 5.) Defendants' wells are pumping water that includes subflow. Although Arizona has retained a bifurcated water-rights system, the Ninth Circuit has recognized the hydraulic connection between surface water and groundwater. In *United States v. Orr Water Ditch Co.*, the Ninth Circuit held that although a federal decree granting senior water rights to the Pyramid Lake Paiute Tribe to the Truckee River did not contain language "explicitly protecting" the Tribe's decreed rights "from diminution of the flow of the river resulting from allocation of groundwater to other users," the decree there nonetheless "protects the Tribe from allocations of groundwater that would adversely affect its decreed water rights." 600 F.3d 1152, 1158–59 (9th Cir. 2010). This is because "[s]urface water contributes to groundwater, and groundwater contributes to surface water. The reciprocal hydraulic connection between groundwater and surface water has been known to both the legal and professional communities for many years." *Id.* at 1158. The Court finds the *Orr Ditch* case instructive and, applying that Ninth Circuit reasoning, concludes the Decree protects Plaintiffs' decreed rights from diminution of the flow of the Gila River resulting from groundwater being drawn by other water users, including Defendants. Therefore, Defendants' diversion of Gila waters through their non-decreed wells is a violation of the Decree. Following Judge Bolton's 2018 Order, and in the absence of any authority or Decree provision allowing for any non-decreed diversions, even if *de minimis*,[25] the Court

---

[25]Defendants argued for the first time at oral argument that *Gila IV* supports their assertion that shutting off their wells is too drastic a remedy because *Gila IV*

1    must order the Gila Water Commissioner to shut off and seal Defendants' wells so long as
2    Defendants continue to lack Decree rights for those wells.

3                                    5.    <u>Injunctive Relief</u>

4            In Claim Three of their Complaint, Plaintiffs seek "an injunction requiring the
5    defendants to cease and prevent diversion, pumping, or deliveries of the waters of the Gila
6    River to lands without Decree rights."  (Doc. 1 ¶ 78; Doc. 112 ¶ 69.)  However, in their
7    Motion, Plaintiffs state:  "Although Claim Three in the complaint seeks an injunction
8    against future pumping by these defendants, summary judgment on Claim Three is
9    unnecessary so long as Defendants have not indicated an intention to use water from other
10   new or existing wells to replace water from wells shut down under Claim Two."  (Doc. 78
11   ep 33, n.3.)  In their Reply, Plaintiffs do not say anything about whether Defendants have
12   indicated they intend to use water from other new or existing wells to replace the water
13   from the wells that would be shut down under Claim Two.  Indeed, Defendants state if this
14   Court rules in favor of Plaintiffs, "Defendants' farms will be shut down" (Doc. 85 ep 40),
15   which indicates they have no such intention.  Therefore, the Court concludes an injunction
16   is unnecessary and declines to enter such an order.

17   **V.    DEFENDANTS' MOTION TO DISMISS COMPLAINT-IN-INTERVENTION**

18           In November 2021, this Court granted Defendants' Motion to Amend their Answer
19   to the Community's Complaint, thus allowing Defendants to add new affirmative defenses,
20   including their argument that this Court lacks jurisdiction over the Community's claims
21   and the Community's claims are precluded because of the 2005 Agreement.  (Docs. 55,
22   70.)  Shortly thereafter, the Tribe moved to intervene because, after Defendants amended
23   their answer and added Community-specific defenses, the Tribe became aware that the
24   Community could no longer adequately defend its interests.  (Doc. 76.)  The Court granted

25   _____

26   acknowledged:  "wells that, though pumping subflow, have a *de minimis* effect on the river
27   system may be excluded from the adjudication based on rational guidelines for such an
     exclusion, as proposed by [A]DWR and adopted by the trial court."  (Doc. 136 at 12:14–
28   20 (citing *Gila IV*, 9 P.3d at 1083).)  Because Defendants did not properly raise this in their
     briefing, the Court declines to address this point.

permissive intervention (Doc. 110), and the Tribe filed its Complaint-in-Intervention, which contains identical claims to the Community's. (Docs. 1, 112.) Defendants move to dismiss the Complaint-in-Intervention pursuant to Rule 12(b)(1) based on the prior exclusive jurisdiction doctrine. (Doc. 111.)

For the reasons stated above in Section IV(A)(1), this Court retains exclusive jurisdiction over claims involving the Gila River mainstem waters. Accordingly, Defendants' motion to dismiss based on that same theory is denied.

## VI.    PLAINTIFFS' MOTION TO STRIKE AND MOTION FOR SANCTIONS

Plaintiffs jointly move to strike Defendants' Motion to Dismiss the Complaint-in-Intervention and move for sanctions. (Doc. 116.) Plaintiffs argue the Motion to Dismiss violates the Scheduling Order and was filed for the purpose of delay. (*Id.*) Although Defendants did not ask for leave to file the Motion to Dismiss, the Court, in its discretion, declines to award sanctions and simply denies the Motion to Dismiss on the merits. Therefore, Plaintiffs' motion to strike and for sanctions is denied.

## VII.   CONCLUSION

For the reasons above, the Court concludes the Decree is the sole source of Gila mainstem water rights, the Decree is comprehensive as to the Gila mainstem, and the Decree is enforceable against non-parties to the Decree to the extent the Decree protects Decree rights from diminution resulting from unauthorized diversions of mainstem water. Therefore, this Court has exclusive jurisdiction over the mainstem claims in this case. The Court also concludes the Community's claims here are not precluded by the 2005 Agreement. Accordingly, Defendants are not entitled to summary judgment.

The Court also concludes that, in the absence of authority to the contrary, the Decree does not allow any use of Gila mainstem water—even *de minimis* use—without a Decree right. Furthermore, the Court concludes the presumption of saturation applies here, and the Court need not wait for ADWR to delineate the subflow zone, but can apply the *Gila IV* test to evaluate whether wells are pumping subflow.

Last, the Court appreciates the scarcity of water and is sensitive to the fact Plaintiffs'

requested relief will result in Defendants being unable to operate their farms as in the past. But, based on the record and arguments presented, the Court concludes the Community has met its burden of showing, based on the undisputed facts, the Schoebroek Well and Sexton Wells 1, 2, and 3 are pumping some Gila River subflow in violation of the Decree. Accordingly,

**IT IS ORDERED:**

(1) Plaintiffs' Motion for Summary Judgment (Doc. 78) is **GRANTED** on Claims One and Two and **DENIED** on Claim Three.

(2) Defendants' Motion for Summary Judgment on Claim Preclusion Grounds (Doc. 87) is **DENIED**.

(3) Defendants' "Motion for Summary Judgment on the Application of the Prior Exclusive Jurisdiction Doctrine and the Validity and Enforceability of Forum Selection Clause" (Doc. 89) is **DENIED**.

(4) Defendants' "Request for Judicial Notice In Support of Defendants' February 18, 2022 Filings" (Doc. 91) is **GRANTED**.

(5) Defendants' "Rule 12(b)(1) Motion to Dismiss the San Carlos Apache Tribe's Complaint in Intervention Based on the Prior Exclusive Jurisdiction Doctrine" (Doc. 111) is **DENIED**.

(6) Plaintiffs' "Joint Motion to Strike Defendants' Motion to Dismiss the San Carlos Apache Tribe's Complaint-in-Intervention and Motion for Sanctions" (Doc. 116) is **DENIED**.

(7) Plaintiffs shall file proposed orders of judgment for Claims One and Two on or before **Monday, September 11, 2023**.

Dated this 5th day of September, 2023.

Honorable Scott H. Rash
United States District Judge